**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

**UNITED STATES OF AMERICA**                                        **PLAINTIFF**

**v.**                          **Case No. 4:15-cr-00144 KGB**

**RAFAEL PADILLA**                                                  **DEFENDANT**

## ORDER

Before the Court is defendant Rafael Padilla's motion to suppress evidence (Dkt. No. 13) to which the government has responded in opposition (Dkt. No. 14).  Mr. Padilla seeks to suppress any physical evidence seized from the car Mr. Padilla was driving; any evidence or statements obtained, directly or indirectly, as a result of any unlawfully seized evidence; and any statements that were made while in custody and without the benefit of *Miranda* warnings.  *See Miranda v. Arizona*, 384 U.S. 436 (1996).

Mr. Padilla argues that he committed no traffic violation; thus, he contends that there was no probable cause to stop the vehicle and that all evidence seized as a result of the traffic stop should be suppressed (Dkt. No. 14, at 3).  The government asserts that there was a traffic violation providing probable cause to stop the vehicle and that the search was lawful.  The government also contends that, even if the traffic stop was unlawful, Mr. Padilla consented to a search of his car, which neutralized any taint allegedly stemming from the stop (Dkt. No. 14, at 1).  The government also maintains that there was probable cause to search for a compartment in the car.

The Court conducted a hearing on Mr. Padilla's motion to suppress on June 7, 2016.  At the hearing, the Court heard oral argument from both parties.  Mr. Padilla and the government presented witnesses who testified in open court.  Mr. Padilla testified on behalf of himself.  At

the conclusion of the hearing, the Court took the motion under advisement.  For the reasons that follow, the Court denies Mr. Padilla's motion to suppress (Dkt. No. 13).

## I.      Factual Background

At the hearing on Mr. Padilla's motion to suppress, the government introduced several exhibits, including a video recording of the traffic stop.  The government previously filed this video as an exhibit to its response in opposition to Mr. Padilla's motion to suppress (Dkt. No. 14, Ex. A).  The government also presented testimony at the hearing from Arkansas State Police Trooper Brandon Bennett and Arkansas State Police Corporal Rocky Rapert.  In support of his motion, Mr. Padilla testified on his own behalf.

Trooper Bennett has 10 years of law enforcement experience.  He has attended training sessions sponsored by the Arkansas State Police, as well as training regarding drug courier profiles and border locations, one of which is McAllen, Texas.  The government also presented testimony from Corporal Rapert.  He has 12 and a half years of law enforcement experience.

Trooper Bennett testified that, on February 24, 2015, he was on duty and parked on Interstate 55 in Mississippi County, Arkansas, near the 60-61 mile marker.  He saw a Kia sport utility vehicle driven by Mr. Padilla pass his position and immediately apply the brakes.  Trooper Bennett estimates that Mr. Padilla abruptly slowed from about 70 miles per hour to about 60 miles per hour.  Trooper Bennett then left his parked position and began to follow Mr. Padilla in his vehicle.  Trooper Bennett asserts that, as he was following Mr. Padilla, Mr. Padilla's vehicle was "at most, one car length behind a tractor-trailer in the right lane." (Dkt. No. 14, at 1). Trooper Bennett then observed Mr. Padilla pass the tractor-trailer in the left lane and testified that Mr. Padilla appeared nervous, was sitting perfectly straight, and was holding the steering

wheel in a two-handed "white knuckle" grip (*Id.* at 2).  During his testimony, Mr. Padilla denied being nervous.

Trooper Bennett testified that, through his training and experience, he has learned that these signs indicate potential unlawful action.  Trooper Bennett also testified that, when he initially observed Mr. Padilla, he decided to conduct a traffic stop because Mr. Padilla was following the tractor-trailer too closely.  He stated that he has received training by attending classes in traffic law and accident investigation.  In his classes, he was taught that you should have a car length between vehicles for every ten-mile-per-hour increment the vehicles are traveling, so in this case that would be six to seven car lengths between vehicles.  On cross examination by Mr. Padilla's counsel, Trooper Bennett testified that he is also aware from his training that it is permissible to follow a tractor-trailer closely while a person is attempting to pass the tractor-trailer.  Trooper Bennett explained that he has responded to traffic accidents where people were following tractor-trailers too closely and that these accidents have ranged from fender-benders to fatalities.  He has pulled people over many times for following tractor trailers too closely.

At the 63-mile marker, Trooper Bennett radioed in Mr. Padilla's vehicle tags.  Trooper Bennett testified that this information is useful because finding out about a driver's past criminal history, about any outstanding warrants, and information of that nature has the potential to save his life.  Corporal Rapert answered Trooper Bennett's radio call, ran Mr. Padilla's vehicle tags, and informed Trooper Bennett that the License Plate Reader indicated that the vehicle in which Mr. Padilla was traveling had crossed the border from Mexico into the United States at approximately 12:30 p.m. on February 23, 2015, the day before.  Corporal Rapert testified that

he relayed this information because the majority of the narcotics in this country come from Mexico.

Trooper Bennett followed Mr. Padilla for what he estimates was three to four miles while he received Mr. Padilla's vehicle tag information. After that, at the 67-mile marker, Trooper Bennett activated his blue lights and siren. He pulled Mr. Padilla over. In its response in opposition, the government contends that Trooper Bennett conducted the traffic stop of Mr. Padilla's car because Mr. Padilla violated Ark. Code Ann. § 27-51-305, which prohibits "follow[ing] another vehicle more closely than is reasonable and prudent, having due regard for the speed of vehicles and the traffic upon and the condition of the highway." (Dkt. No. 14, at 6).

The Court understands that, when the blue lights on a police vehicle are activated, the center-mounted dashboard camera in the patrol car activates, begins to film, and, in fact, captures approximately one minute of activity prior to the blue lights being activated. In the government's response it represents that:

> Bennett's car was equipped with a dashcam and a lapel microphone. The camera saves video from 60 seconds before the trooper engages [his] police lights. The camera begins saving audio when the police lights are activated. When Bennett observed Padilla drive too closely to the tractor-trailer, he did not immediately activate his police lights and stop Padilla, waiting instead until he had gotten information from dispatch about Padilla's license plate number. Thus, although Bennett's traffic stop was captured on the dashcam, the traffic violation that led Bennett to stop Padilla is not captured on the video because Bennett did not turn on his blue lights until 3-4 miles (*i.e.*, more than one minute of driving time) after he saw Padilla commit the traffic violation.

(Dkt. No. 14, at n.1).

Trooper Bennett also testified that the traffic violation he witnessed and that prompted him to stop Mr. Padilla was not captured on the video. Based upon this representation, the Court understands the government to be contending that the alleged traffic violation does not appear on the video that is attached as Exhibit A to its response in opposition.

Trooper Bennett then approached Mr. Padilla's car and informed him that he had been pulled over because he was following a tractor-trailer too closely (Dkt. No. 14, Ex. 1).  Trooper Bennett then asked Mr. Padilla a series of questions, including where he was going, where he had come from, whether he had recently crossed the border, and if he had ever been arrested.  Mr. Padilla told Trooper Bennett that he was traveling to visit his children in Chicago, Illinois, and had left his home in McAllen, Texas, at 6:00 a.m. on February 23, 2016.  Mr. Padilla also told Trooper Bennett that he had crossed the border a week earlier and had never been arrested (Dkt. No 14, Ex. 1).

Trooper Bennett then returned to his patrol vehicle to conduct a criminal history check.  He claims he learned then *via* radio that Mr. Padilla has been arrested for cocaine and marijuana possession but that those charges had been dismissed.  Trooper Bennett testified that Corporal Rapert came onto the scene to speak with Mr. Padilla soon after Trooper Bennett's initial approach.  Both Trooper Bennett and Corporal Rapert testified that, because of the discrepancies between Mr. Padilla's answers about crossing the border and having been arrested and because of the information Trooper Bennett received from Corporal Rapert, Corporal Rapert asked Mr. Padilla if he would consent to a search of the car.  Mr. Padilla consented to the search and stood next to Trooper Bennett's vehicle on the side of the road without being restrained in any way while Trooper Bennett and Corporal Rapert searched Mr. Padilla's vehicle.

The Troopers searched the car for approximately eight minutes and did not find any drugs or contraband.  The Troopers testified, however, that they saw indications that Mr. Padilla's rear seat had been removed and replaced, including scratches on the plastic molding of the car, paint-stained carpet, tool marks, and spray painted bolts (Dkt. No. 14, at 3).  Trooper Bennett indicated that to him this signified the backseat of Mr. Padilla's vehicle had been removed.  He also

testified that he had received training that "re-paints and marks" indicate potential hidden compartments. Corporal Rapert echoed this testimony. Corporal Rapert testified that he received training on detecting hidden compartments and that the markings in Mr. Padilla's car were consistent with what he understood to be a hidden compartment.

After making these observations, Corporal Rapert asked Mr. Padilla if he had recently crossed the border. Mr. Padilla initially denied having crossed the border; then he changed his answer to say that he had crossed the border on foot, and he finally explained that he had crossed the border in his vehicle. Corporal Rapert then asked Mr. Padilla if anyone had removed the backseat of his car, and Mr. Padilla responded that it had been removed at an interior border patrol checkpoint. Mr. Padilla then told Corporal Rapert that he had left his home at 1:00 the day before, not 6:00 a.m. as Mr. Padilla previously said to Trooper Bennett.

Eventually, Trooper Bennett asked Mr. Padilla if he would follow the Troopers to a nearby garage so that they could examine the area underneath his car. Trooper Bennett testified that this is his normal practice. Mr. Padilla asked if he had to accompany the Troopers, and Trooper Bennett answered no. Mr. Padilla then refused to consent to accompanying the Troopers for this purpose and stated that he was tired and had "already let [them] search the car." (Dkt. No. 14, at 4, Ex. 1). After Mr. Padilla refused to accompany the Troopers to the garage, Corporal Rapert deployed his drug dog. The drug dog was on the scene, in Corporal Rapert's vehicle. Corporal Rapert testified that the dog was trained to detect narcotics, including cocaine, and that he has handled the dog for four years. The government contends that the dog indicated that it detected contraband in the rear underside of Mr. Padilla's car by alerting under the vehicle. Corporal Rapert testified that the dog alerted when he changed his behavior underneath the car at a location corresponding with the marks inside the car. Trooper Bennett then informed Mr.

Padilla that he could either drive his car to the auto-shop garage for a search, or they could have his car towed to the nearby garage.  Mr. Padilla chose to drive himself.  Trooper Bennett testified that, at this time, Mr. Padilla was not restrained in any way.

The government represents that, at the garage, the backseat was removed from Mr. Padilla's vehicle, and the Troopers found two small compartments that had been cut into the metal underneath the rear seat.  Inside the compartments, the Troopers located two packages of white powder wrapped in electrical tape, which were later identified by laboratory testing as two kilograms of cocaine.   After the discovery of these packages, Mr. Padilla was arrested for possession of cocaine with intent to distribute.  At the hearing on the motion to suppress, the government introduced photographs of the rear compartments of the vehicle, both of the bundles of cocaine while in the compartments, and the bundles after they were removed from the vehicle compartments (Gov. Ex. 2-5).

At the request of the parties, the Court takes judicial notice of Ark. Code Ann. § 27-51-305, which provides:

(a) The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of vehicles and the traffic upon and the condition of the highway.

(b) (1) The driver of any motor truck or any motor vehicle drawing another vehicle when traveling upon a roadway outside of a business or residence district shall not follow within two hundred feet (200') of another motor vehicle.

(2) The provisions of this subsection shall not be construed to prevent overtaking and passing.

Mr. Padilla contends that he was following too closely, and thus in violation of Ark. Code Ann. § 27-51-305(a), so that he could overtake or pass the truck consistent with Ark. Code Ann. § 27-51-305(b).  For this reason, Mr. Padilla contends that his actions were permissible and that this was an impermissible traffic stop.  The government argues that the language in subsection

(b)(2) states that "[t]he provisions of this subsection shall not be construed to prevent overtaking and passing" and, thus, does not explicitly allow a vehicle to get closer than subsection (a) provides.

## II.     Analysis

The "cardinal principle" in Fourth Amendment search and seizure jurisprudence is that "'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Mincey v. Arizona*, 437 U.S. 385, 390 (1978) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)); *see United States v. Marshall*, 986 F.2d 1171, 1173 (8th Cir. 1993) (quoting same). "When the government seeks to introduce evidence that was seized during a warrantless search, it bears the burden of showing the need for an exemption from the warrant requirement and that its conduct fell within the bounds of the exception." *Marshall*, 986 F.2d at 1173 (citing *Mincey*, 437 U.S. at 390).

At the outset, the Court understands that Mr. Padilla objects to the initial stop. He is not disputing his consent to the initial search shortly after he was stopped but suggests this consent was not voluntary and that this consent was insufficient to remove the purported taint resulting from what he contends was an illegal stop. The Court also believes Mr. Padilla to be arguing only that he did not consent to the second request for search because his consent was withdrawn when he refused to go to the nearby garage. The Court will examine each issue presented.

### A.     Initial Traffic Stop

When a law enforcement officer stops a motor vehicle and questions its occupants, the stop constitutes a seizure under the Fourth Amendment, even though the purpose of the stop is limited and the resulting detention is quite brief. *Brendlin v. California*, 551 U.S. 249, 255-56

8

(2007); *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *United States v. Wheat*, 278 F.3d 722, 726 (8th Cir. 2001). A traffic stop is legal under the Fourth Amendment if it is supported by probable cause to believe that a violation of law has occurred. *Whren v. United States*, 517 U.S. 806, 810 (1996). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). In making this assessment, the Court must disregard the officer's subjective intent which plays "no role in ordinary, probable-cause Fourth Amendment analysis." *Whren*, 517 U.S. at 813.

It is well-established that a traffic violation, however minor, creates probable cause to stop the driver of a vehicle. *See United States v. Beck*, 140 F.3d 1129, 1133 (8th Cir. 1998) (citations omitted). Although probable cause requires articulable facts, it does not require that the officer making the traffic stop cite a specific rule of law, nor does "[t]he mere fact an incident report omits certain details . . . render the officer's testimony concerning the underlying action facially implausible." *United States v. Mendoza*, 677 F.3d 822, 828 (8th Cir. 2012). In *Mendoza*, the arresting officer's report described the justification for probable cause as the driver making "random turns and stops" in addition to "not signaling . . . and driving erratically." *Id.* at 827-28. Despite not invoking specific statutory violations of the traffic code, the Eighth Circuit determined the officer's description of the conduct aligned with the alleged statutory violation and, therefore, the officer's observations created probable cause. *Id.* at 828.

As stated above, the constitutional reasonableness of traffic stops does not depend on the actual motivations of the individual officers involved. *Whren*, 517 U.S. at 813. "Once an officer has probable cause, the stop is objectively reasonable and any ulterior motivation on the officer's part is irrelevant." *United States v. Frasher*, 632 F.3d 450, 453 (8th Cir. 2011) (quoting *United*

9

*States v. Arciniega*, 569 F.3d 394, 397 (8th Cir. 2009)).   Nevertheless, as other courts have acknowledged, the Court can consider the officer's motivation in assessing his or her credibility. *See United States v. Wilkinson*, 633 F.3d 938, 943 (10th Cir. 2011) ("We agree that the district court could have considered the officers' motivations in assessing their credibility."); *United States v. Gonzalez-Garcia*, 781 F. Supp. 2d 1167, 1174 (D. Kan. 2011) (citing same).

Here, the Court first examines whether the initial traffic stop was reasonable.  Mr. Padilla disputes whether Trooper Bennett actually witnessed any traffic violation on the part of Mr. Padilla.  Mr. Padilla specifically contends that "Trooper Bennett was wrong in his assertion that Defendant Padilla was following too closely.  No objectively reasonable law enforcement officer would have stopped Defendant Padilla based on what can be seen on the videotape of the stop." (Dkt. No. 13, at 3).

The Court finds credible and credits Trooper Bennett's testimony concerning the traffic violation.  The Court understands that Trooper Bennett observed the traffic violation before he activated the blue lights and before the center-mounted dashboard camera in the patrol car began to film.  His observation of the alleged traffic violation is what prompted him to pull out and begin to follow Mr. Padilla.  Mr. Padilla admitted under oath at the hearing that he lied to the Troopers about crossing the border and his previous arrest record.  As a result, the Court questions Mr. Padilla's credibility, including his credibility in describing these events surrounding the alleged traffic violation.  Further, the Court credits Trooper Bennett's training and experience regarding these types of traffic violations.

The Court also does not accept Mr. Padilla's arguments regarding Ark. Code Ann. § 27-51-305(b)(2).  This subsection provides an exception to the language of (b)(1), not the language of subsection (a).  This Court concludes that, under subsection (a), the driver of a motor vehicle

shall not follow another vehicle more closely than is reasonable and prudent, even when overtaking and passing another vehicle.

To the extent Mr. Padilla suggests that the questions asked of him by the Troopers after the traffic stop was initiated were improper or exceeded the scope of the traffic stop, the Court rejects his argument. Mr. Padilla was asked questions regarding his travel history, his criminal history, and where he was going. The Eighth Circuit Court of Appeals has held that such questioning is within the scope of inquiry allowed by officers making a traffic stop. *See United States v. Rivera*, 570 F.3d 1009, 1013 (8th Cir. 2009) (examining and finding permissible these types of questions when asked at a traffic stop); *United States v. Long*, 532 F.3d 791, 795 (8th Cir. 2008); *United States v. Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008).

Even if the traffic stop was not objectively reasonable, this Court determines that Mr. Padilla's later initial consent to a search of his vehicle neutralized any taint stemming from the traffic stop. *See United States v. Herrera-Gonzalez*, 474 F.3d 1105, 1111 (8th Cir. 2007) (*citing United States v. Becker*, 333 F.3d 858, 861-862 (8th Cir. 2003)).

### B. Initial Consent To Search

Mr. Padilla contends that his initial consent to search his vehicle was limited to the initial search on the highway and was later withdrawn when he refused to give the Troopers consent to take the car to a nearby garage for further search. Mr. Padilla also argues that his consent was withdrawn before the search that led to the discovery of the drugs. Trooper Bennett and Corporal Rapert testified that Mr. Padilla consented to a search of his vehicle, and the Court finds that Mr. Padilla's consent to the initial search is audible on the video of the traffic stop (Dkt. No. 14, Ex. 1). Mr. Padilla does not dispute this; he testified that he gave his consent for the initial search.

The government bears the burden of proving voluntary consent to search by a preponderance of the evidence. *United States v. Czeck*, 105 F.3d 1235, 1239 (8th Cir. 1997). Voluntarily-obtained consent obviates the need for government officials to obtain a search warrant before conducting a search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). The Eighth Circuit Court of Appeals examines 11 factors and the totality of the circumstances, as set forth in *United States v. Chaidez*, 906 F.2d 377 (8th Cir. 1990), to determine whether consent given was voluntary. The *Chaidez* factors include the age, intelligence, and mental state of the person giving consent; the nature of the detainment including the number of police officers involved, the level of custody, and the place of detainment; and the prior experience of the person from whom consent is requested which might establish a more voluntary or knowing consent. *Id.* at 381.

In general terms, "the scope of a consensual search is measured by what the typical reasonable person would have understood by the exchange." *United States v. Brown*, 345 F.3d 574, 580 (8th Cir. 2003) (internal quotations omitted). Additionally, the scope of a search is generally defined by its "expressed object," which in the instant case would be to search the vehicle. *United States v. Ferrer-Montoya,* 483 F.3d 565, 568 (8th Cir. 2007) (citing *Florida v. Jimeno,* 500 U.S. 248, 251 (1991)).

Applying the *Chaidez* factors and examining the totality of the circumstances, the Court concludes the government has proven by a preponderance of the evidence voluntary consent to search the vehicle. Mr. Padilla is an adult. There is no indication in the record that he presents with anything less than average intelligence or a competent mental state at the time he was asked to consent. There were two Troopers on the scene when the request was made. The request was made when Mr. Padilla was outside, by the side of the road. He was not physically restrained in

any way at the time the request was made.  The Troopers did not pressure Mr. Padilla, and the Troopers did not speak in a rude manner to Mr. Padilla during this exchange.  The Troopers knew he had previously crossed the border and had previously been arrested on a narcotics charge.  He audibly consented to the search, as evidenced by the videotape exhibit.  For these reasons, the Court concludes that Mr. Padilla knew that he was consenting voluntarily to a search of the car.

To the extent Mr. Padilla argues that the evidence sought to be suppressed is the direct result of the allegedly unconstitutional traffic stop and that Mr. Padilla's intervening consent was not an independent, lawful cause of the search and seizure, the Court rejects that argument.  "An illegal detention is only the start, and not the end, of [the Fourth Amendment] analysis, for the evidence seized from [defendants] and their vehicle need not be suppressed if their voluntary consent provided an independent basis for the search."  *United States v. Esquivel*, 507 F.3d 1154, 1158–59 (8th Cir. 2007) (citations omitted).  That determination involves asking whether "granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."  *Wong Sun v. United States*, 371 U.S. 471, 488 (1965) (citations omitted).

Subsequent voluntary consent to search may purge the taint of the illegal traffic stop, but a voluntary consent to search, "preceded by an illegal police action, does not automatically purge the taint of an illegal detention."  *United States v. Barnum*, 564 F.3d 964, 971 (8th Cir. 2009) (citations omitted).  To determine whether voluntary consent is "an independent, lawful cause of the search," the Court must consider:  "(1) the temporal proximity between Fourth Amendment violation and grant of consent to search; (2) the presence of any intervening circumstances; and

(3) the purpose and flagrancy of the officer's Fourth Amendment violation."  *Barnum*, 564 F.3d at 971 (citing *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975)).

In considering the first *Brown* factor, the temporal proximity between any alleged Fourth Amendment violation and the grant of consent to search, the Court notes that "the closer this period, the more likely the defendant's consent was influenced by, or the product of, the police misconduct."  *Id.* at 972 (citing *United States v. Simpson*, 439 F.3d 490, 495 n. 3 (8th Cir. 2006)).  Here, the record indicates that Mr. Padilla gave his consent to search the vehicle about three and a half minutes after the traffic stop was initiated (Dkt. No. 14, Ex. 1).  The time period between Mr. Padilla's initial consent and his later refusal to take the vehicle to a nearby garage for a more extensive search was about an hour and a half (*Id.*).  The Court considers the operative consent here to be Mr. Padilla's initial consent, not his later refusal to travel to the nearby garage.  While the Eighth Circuit Court of Appeals has held that a period of about nine minutes between stop and consent is enough to purge the taint of any illegality, it has not held that a matter of a few minutes would do the same.  Thus, considering the first *Brown* factor, the short time between the traffic stop and Mr. Padilla's consent, slightly favors the government.

Under the second *Brown* factor, the presence of any intervening circumstances, the Court recognizes "that an intervening circumstance between the Fourth Amendment violation and the defendant's consent indicates that the consent was made of the defendant's free will and that the officer was not attempting to exploit an illegal situation."  *Brown,* 422 U.S. at 603–04.  The government argues that Trooper Bennett had reason to believe that Mr. Padilla lied to him about crossing the border and his criminal history, based on the questions asked after the traffic stop was initiated.  As a result, the government contends these discrepancies led Trooper Bennett to suspect criminal activity and constitute the sort of intervening circumstances necessary for Mr.

14

Padilla's consent to override the effect of an alleged illegal stop.   The government cites in support of its argument *United States v. Becker*, 333 F.3d 858, 860 (8th Cir. 2003), in which the Eighth Circuit Court of Appeals determined that the officer's conclusion that the defendant was intoxicated constituted sufficient intervening circumstance to purse the taint of an illegal stop.   In *Becker*, the court noted that the defendant was not advised of his right to refuse consent to search, although the court concluded the defendant was aware of this right.   *Id.* at 862.   The government also cites *United States v. Thomas*, 83 F.3d 259, 259 (8th Cir. 1996), in which the Eighth Circuit Court of Appeals determined that discrepancies in mileage on a car and rental agreement that created suspicion of criminal activity, along with the officer making the individual aware of his right to refuse consent, constituted intervening circumstances between an illegal stop and the driver's consent to search.   Given these controlling authorities as compared to the facts of this case, the Court concludes the second *Brown* factor, the intervening circumstances between the traffic stop and Mr. Padilla's consent, favors the government.

Finally, with respect to the third *Brown* factor, the purpose and flagrancy of the officer's Fourth Amendment violation, "[a] Fourth Amendment violation may be purposeful or flagrant under various circumstances, including where the violation was investigatory in design and purpose and executed in the hope that something might turn up."   *Barnum*, 564 F.3d at 973 (citations omitted).   As in *Barnum*, this Court finds that a reasonable view of Trooper Bennett's testimony supports a finding that he did not act purposefully or flagrantly by initiating an illegal traffic stop.   *See id.*   According to his testimony, Trooper Bennett testified the traffic stop was strictly the result of what he believed was a violation of Ark. Code Ann. § 27-51-305(a). Trooper Bennett testified to his training and experience with this type of traffic stop.   Although Trooper Bennett's belief that Mr. Padilla violated Ark. Code Ann. § 27-51-305(a) may have been

objectively unreasonable, an unreasonable mistake of law or fact is not the type of "blatantly unconstitutional or flagrant behavior" condemned in *Brown*.  *Barnum,* 564 F.3d at 973.

Courts have found such blatantly unconstitutional and flagrant behavior where:  "(1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed in the hope that something might turn up." *United States v. Simpson*, 439 F.3d 490, 496 (8th Cir. 2006) (quoting *Brown*, 422 U.S. at 605). The Court does not find reason in the record to believe that Trooper Bennett initiated the stop because of blatantly unconstitutional or flagrant behavior.  Thus, the third *Brown* factor favors the government.

The Court, considering the three *Brown* factors together, finds that the short time between the stop and the voluntary consent given by Mr. Padilla, combined with the intervening circumstance, when weighed against the absence of blatantly unconstitutional or flagrant behavior, is enough to purge any alleged taint purportedly resulting from the claimed Fourth Amendment violation and to make Mr. Padilla's initial consent an independent, lawful cause of the search.

### C.      The Search At The Garage

The government contends that Mr. Padilla does not challenge the use of the drug dog or the fact that his detection of contraband provided probable cause to search Mr. Padilla's car at the nearby garage (Dkt. No. 14, at n.6).  This Court understands that Mr. Padilla argues that he did not consent to the second request for search because his consent was withdrawn when he refused to go to the nearby garage.  The Court rejects any attempt by Mr. Padilla to argue that, because the initial traffic stop was impermissible or because he withdrew his consent to search

when he refused to go to the nearby garage, the search at the nearby garage is tainted and that any evidence obtained by the Troopers from the search at the nearby garage should be suppressed as "fruit of the poisonous tree" due to the impermissible traffic stop or the withdrawn consent.

Any arguments on this point fail because Mr. Padilla's initial consent lead to the search of the car on the highway which allowed the Troopers to view evidence of alleged tampering and/or the prior removal of the backseat.  Once the Troopers saw this evidence, they had obtained reasonable suspicion to continue searching.  At that point, the Troopers requested to change locations from the highway to the nearby garage to conduct a more extensive search.  That Mr. Padilla withdrew his consent at that point and did not consent to the continuing search at the nearby garage does not negate the reasonable suspicion that the Troopers had already acquired.

Further, after Mr. Padilla refused to consent to the search at the nearby garage, Corporal Rapert deployed his drug dog that alerted to suspected contraband concealed in Mr. Padilla's vehicle on the side of the highway.  Corporal Rapert's drug dog was on the scene, in his police cruiser, so there can be no argument that this action in any way delayed the stop or pushed it beyond permissible limits.  This alert by the drug dog provided the Troopers with further reasonable suspicion that made their continued search at the nearby garage constitutional.

In sum, the Court finds the initial traffic stop was objectively reasonable.  Further, even if the traffic stop was not objectively reasonable, the Court finds that Mr. Padilla's consent to the intial search was an independent and intervening cause that served to purge any alleged taint of illegality involved in the challenged stop.  The Court is not persuaded by Mr. Padilla's argument that his consent was withdrawn when he refused to go to the nearby garage or that any search

after that withdrawal of consent was unconstitutional. Mr. Padilla likely did withdraw his consent by refusing to accompany the Troopers to the nearby garage, but at that time, the Troopers already had sufficient probable cause to conduct a more extensive search as a result of their personal observations of the alterations in the backseat of the vehicle and the subsequent drug dog alert.

***

For the foregoing reasons, the Court denies Mr. Padilla's motion to suppress (Dkt. No. 13).

So ordered this the 23rd day of June, 2016.

Kristine G. Baker
United States District Judge